Do we have the parties for you? All right, Ms. Cagle, good morning. Good morning. So you have five minutes, but you reserved a minute for rebuttal, which means a minute that you'll save for after you hear from the other side. So the floor is yours, you may proceed. Thank you. I'm here on a special appearance and my personal cosmo. Excuse me, Ms. Cagle, Ms. Cagle, I'm going to interrupt you for just a second. If you could move the microphones down a little bit, it might pick up your voice a little bit better. I was having trouble hearing you. Okay. Thank you. Okay. Sorry about that. I'm here on a special appearance and my personal persona appealing the dismissal of the case on the grounds that my termination was discriminatory and procedurally unjust. So my employer failed to accommodate my longstanding religious beliefs and documented medical disability. So with respect to the religious beliefs, did you tell your employer that you wanted an accommodation based on your religious beliefs? I sent two emails on August 31st of 2021 and also March 7th of 2022. And that was after the fact. After the fact. Yes. Because I was out on a documented medical leave that they were aware of because they had to approve it for me to be on that medical leave. Why weren't you, wasn't there a period of time in which the, there was an opening period in which if anybody had a religious, a claim for a religious exception, they could make it at a deadline and then you passed the, that expired before you took action? Yes. That expired before I took action. Why did you let that expire? Well, I was medically incapacitated as proof of the doctor's note that was in the evidence that I provided with my complaint. Uh-huh. Okay. Well, I just, what I did know, wanted to know is whether you were incapacitated to the point where you didn't know about the deadline or incapacitated in the sense that you were unable to comply with the deadline? Well, I didn't know about the deadline as well. You didn't? I didn't know about it. I did know about the exemption being put out there, but the deadline, no. I wasn't aware of the deadline. So, during the time that the deadline and things came about, I was dealing with a delicate, serious situation in the hospital at that time that they were aware of. I didn't want to share it because they have all the information on paperwork from the doctor notating those things. Yeah. So, I had the impression that maybe they didn't get a request for a religious exemption, but even if they did, that they wouldn't have been able to allow you to keep on your same job. You were going to have to be moved to a different job as an accommodation and be an exemption. You couldn't be a covered person because when you were unvaccinated, the New York law didn't let you continue in the same position. Is that your understanding also? I do have that understanding, but according to the Title VII religious violation that I put into my complaint, that they were to accommodate me without any biased objections. Well, if a reasonable accommodation is available, that's true. But we had a case called We The People a number of years ago. We The People. And that was—we made it very clear there that you could, in effect, keep your job, but you couldn't be a covered person under the Act, under Section 2.1 or whatever it is. You'd have to take another kind of job that didn't expose you to people. If they had an administrative job somewhere or you could work remotely or something of that sort, maybe you could do it, but you wouldn't actually be covered by the Act at all in the sense of having to take the vaccine. Well, the accommodation that I had requested, it was put in after the fact due to the situation. But— You still wanted the job, right, where you would be doing administrative work for 80% and then— 20%. So that's what they were doing. 20% for the clients, right? Yeah, 20%. But we, at that time, we had, because of the pandemic, we had rotating schedules where we would work remotely from home, and then we'll come into office for a week. So that was available, and that would, like, show there was no undue hardship. And I was doing that during the time that I went into the hospital and things of that nature. So that was in effect already before I left. Yeah. Then this law was passed, right? It occurred after you were in family medical leave. Is that right? It said that you could not get an exemption from— So they never even responded. Like, after I sent it, once I got a case, so I was out on the leave, the medical leave, and then I was incapacitated, which is identified under the American Disability Act, right? Yeah. When I come back, they held me at the same standards as if I was actively there in the office working and receiving emails. I was grieving. I had a loss in my family, and I was grieving, okay? What was—I mean, for your Americans with Disabilities Act claim, what is the disability that you are asserting, COVID, that you had COVID? I didn't have COVID. It never was about COVID. It was about the medical reason why I was admitted in the hospital, that they have nature to that. It's in the doctor's note that I presented. It's my private information, medical information, that I didn't want to share publicly. So I wanted to keep that retained for myself, me, and my family. To sue under the Americans with Disabilities Act, you have to show a particular kind of disability that's long-lasting, that's like, you can't use your right leg, and you need to be able to use your right leg to do the job. And that kind of more continuing problem, whereas the FMLA that you used and took leave on can be for something that will go away after a while. So what I think Judge Sullivan was asking, one of my questions is, can you identify for us a disability that you claim they didn't— Okay. So if you can help us with that, that would be useful. So under the Disability Act, one, disability is considered any ailment, any sickness that will stop you from being able to do your activity of daily living. Your mental capacity is not stable or physical. And I had all three of those—mental, emotional, and physical. And so all of that is in the—those are long-lasting, and that's in the doctor's note. So the hospital knows that that's the disability you were claiming. Yes. So it wasn't long-lasting, but the effects of it is, because emotionally it was a problem, and physically for that timeframe from June 24th to August 6th, I was unable to get out of bed and do my activities of daily living. But we're talking about going forward now. Going forward. In order to have a claim saying that you—they needed to give you a job or you needed to be able to continue in your job, and here are the changes they could have made to allow you to continue in your job, we need to understand what the disability is. Because they, you know, Cornell Weill has a state law obligation to make sure that everyone who's a covered employee who deals with patients was vaccinated then. They didn't have a choice about that. So it wasn't a law. It was pretty much—it didn't get abducted until, like, June of 2022. So it wasn't a law at that time. So that's my defense on that. And it's not long-term. It was the fact that because I was disabled at the time, and they were coming at me to, like, get vaccinated, get vaccinated, get vaccinated, and when I returned, they had no provisions there for me to, like, submit the religious exemption. They had nothing there. And according to the ADA, they should do provisional things for the employees that came— that was incapacitated or on the FMLA leave. They should have had those things in place when I returned. I waited to see if anything was going to happen. I called the human resource office and asked them, well, what do you have in place for an employee who was out, who didn't get the notifications, who didn't know to—who couldn't meet the deadline? What was in place for me? There was nothing there. All right. Okay. So you reserve a minute for rebuttal. We've gone over, but that's okay. And now we'll hear from Ms. Kramer. Good morning, Your Honors. May it please the Court. Rachel Kramer on behalf of Weill Cornell Medicine. First, let me just clear up. There was indeed a New York State law in effect in the fall of 2021 that required health care providers like Weill Cornell to ensure that all of their patient-facing employees were vaccinated. That's—I don't think that's disputed. That's in the record. Ms. Cagle's Title VII claim fails for the reasons that the district court found. First of all, while she did email that she was seeking a religious exemption, she never provided the reasons why her religious beliefs prevented her from being vaccinated before the deadline or even after the deadline before she was terminated. So Cornell didn't have notice of the basis for her religious objection. She also can't establish that there was any discriminatory motive on Cornell's part since Cornell was applying this policy to everyone regardless of religion. They terminated her because she didn't get vaccinated. Did Cornell allow some individuals who made religious objections to recast their jobs so that they could continue employment? I'm not sure of the answer to that, Your Honor. But certainly Cornell did not allow any patient-facing employees to continue in their patient-facing roles while remaining vaccinated. Is there a possibility that the plaintiff could have gotten another job that would have taken her out of the coverage of the statute? I suppose if Cornell had a job opening for a non-clinical position, that's a theoretical possibility. But I don't understand that Ms. Cagle was asking for that. In fact, what's in the papers and what I understand is that Ms. Cagle sought to continue in her role, which included 20 percent of her time when she was on site being patient-facing. And it would have been an undue burden for Cornell to permit her to do so unvaccinated because it would have forced us to break the law. That's well established by this court, for example, in De Koonavie Northwell. Was the deadline that Ms. Cagle speaks about, did that bear on the decision to terminate? I'm confused about the timeline a little bit. Sure. So I believe she e-mailed to request an exemption shortly before the deadline, and then while Cornell responded to ask for a religious exemption, without detail, just I would like a religious exemption, while Cornell actually, no, I apologize, Your Honor. She asked for the religious exemption after the deadline that Cornell had set under its policy. And then Cornell wrote back the day before the deadline to become vaccinated, not the deadline to request the exemption, saying, I'm sorry, you're too late. The policy goes into effect tomorrow. But I understand your argument to be that you couldn't have accepted it anyway, whether it was timely or not. That's correct, Your Honor. So timing is irrelevant. It is moot. It's irrelevant. Timing is irrelevant. Yeah, there's no way that we could have lawfully granted the accommodation that she now says she was requesting. And I'll just turn briefly to the disability claim. There's nothing in the pleadings, in either of Ms. Cagle's pleadings, that details any continuing disability that would seriously affect a major life activity. And Ms. Cagle never requested any particular accommodation for such a disability. Attorney Pro Se's complaint on treating with generosity, just to try to understand this claim a little bit, she's saying essentially that she got the Family Medical Leave Act provisions, that went where it was hospitalized to care for her, but was very disabled at that time because that was the basis for the leave. That later on, Weill Cornell may have held that against her and somehow discriminated against her because she took family medical leave and went to the hospital? That doesn't compute for me, Your Honor, based on just the facts and the timeline. Weill Cornell had a policy that said you must be vaccinated by September 1st. Right. Anyone who was not vaccinated and yet who was patient-facing by September 1st would be put on leave and eventually terminated if they didn't remedy the situation. In the absence of a long-term disability, how you could make a claim under the ADA and what the nature of her claim was, I'm not saying it's valid or makes sense under the law. I'm just trying to understand a little bit more what her position is. Yeah, I mean, Your Honor, where I struggle with this claim is I don't understand plaintiffs to be alleging that she had a disability that prevented her from working going forward. In fact, I think she was asking to come back to work as soon as her leave was over, and a six-week leave is not a disability under the ADA. Unless the Court has any other questions, I'll stop there. Thank you. Ms. Cagle, you have a minute before we vote to respond to the points made by Ms. Kramer. So, again, I want to state that, you know, again, it was a policy, and I do have natural rights and natural laws that protect me under the Constitution, which says that their policies doesn't supersede the natural laws of the Constitution. Well, but you're bringing a claim under the Americans with Disabilities Act and Title VII, so that's what we're really focused on. Okay, so we're going to focus on that. For the Americans with Disabilities Act, I mean, you're saying it wasn't COVID, but you were on leave, but it was only six weeks that you were on leave. Is that right? It was only six weeks that I was on leave. I could have took a longer leave, but I decided to go back to work. They have always been like my family for me. They fought for me. So the point Ms. Kramer was making is that six weeks of leave under the Family Medical Leave Act or something else is not enough to establish a disability, which is what you have to have in order to bring an Americans with Disabilities Act claim. Well, they knew I was unavailable for a medical condition that was serious, could have cost me my life, and yet they had no provision for me to present that religious exemption to them. They had nothing there. When I got there, it was like, oh, you just missed the deadline, and that's that. That's unfair. That's unjust. I was focused on the Americans with Disabilities Act, which that's limited to people being deprived of employment or denied benefits of employment because of a physical or mental impairment that substantially limits one or more major life activities, and that usually has to be for a long period of time, not more than six weeks. Well, the emotional disability is still with me right now. But it doesn't prevent you from working, right? No, it doesn't. I'm back to work, and I'm better than ever, but again. I think what they were saying, what I understood, was that the deadline didn't really make any difference, that to have the same job going forward, you were going to have to get vaccinated. There was masks in place. There was that six-week thing. That's what I was doing when I was there in the office. But the law said you had to be vaccinated. It wasn't a law. It wasn't even a legislative body at that time. 261, it wasn't a legislative body. It was just a suggestion at the time of 2021 to June of 2022 when it got codified. So it wasn't a law at the time. September of that year was the year it was when it came into effect, I feel like. Maybe I'm wrong. September. But it got codified in June of 2022. It was just a mere suggestion at the beginning, and that's why I wanted to invoke my federal protective rights under the Title VII Civil Rights Act of 1964. I went to the EEOC. They also granted me the right to sue under that and under ADA. And, you know, that's it. I just feel like I couldn't find any lawyer to help me with the case, and I wouldn't go down laying down without saying anything because that acquiescence says that you agree, and I did agree. All right. Well, we will reserve decision, as we have with the other cases today.